UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN INTERNATIONAL GROUP, INC.,

                              Plaintiff,

        v.

DONG "DEE" CHUNG,

                              Defendant.

No. 06 Civ. 15389 (BSJ)

---

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR AN INJUNCTION

 

Michael B. Carlinsky
Kevin S. Reed
Alexander C.B. Barnard
QUINN EMANUEL URQUHART
 OLIVER & HEDGES, LLP
51 Madison Ave., 22nd Floor
New York, New York 10010
Tel.: (212) 849-7000

Attorneys for American International Group, Inc.

Plaintiff American International Group, Inc. (individually or with it affiliates, "AIG") respectfully submits this memorandum of law in support of its motion for a temporary restraining order and a preliminary injunction compelling its former employee, Defendant, Dong "Dee" Chung ("Defendant"), to: (1) refrain from further disclosing AIG's privileged, confidential and/or trade secret information ("AIG's Protected Information"); (2) return to AIG all such information without keeping any copies; and (3) return to AIG the AIG computers and Blackberry that remain in Defendant's possession despite AIG's demands that they be returned.

**Preliminary Statement**

AIG urgently needs an injunction to prevent Defendant from continuing what has become an escalating campaign of harassment and intimidation that has included, among other things, disseminating AIG's privileged and confidential legal memoranda to AIG's competitors and litigation adversaries; sending confidential business information she misappropriated from AIG to parties inside and outside the company; and sending a daily barrage of e-mails from numerous changing e-mail aliases to AIG directors, officers and employees. In addition, Defendant has ignored AIG's demand that she return a Blackberry and two laptop computers that AIG issued to her, which belong to AIG and which likely contain confidential information belonging to AIG.

Defendant launched her offensive after she was terminated from her position in AIG's Office of Accounting Policy for performance deficiencies and rank insubordination. Based on comments she made at the time she was terminated, it appears that Defendant is at least in part attempting to coerce a payment from AIG. Additionally, Defendant's conduct continues a pattern of misconduct in which Defendant hectors and harasses her former employers. Less than two years ago, the United States Court of Appeals for the Seventh Circuit ordered Defendant to show cause why she should not be sanctioned after finding that she had "use[d] the federal courts

to harass her former employer [KPMG LLP]. . . ." *Chung v. KPMG LLP*, 104 Fed. Appx. 576 (7th Cir. 2004). That order was entered in connection with an affirmance of the dismissal of discrimination claims Defendant had filed against KPMG, her prosecution of which the lower court found to be a "'gross abuse of the civil justice system'". (*Id.*) The Court of Appeals, reviewing the record below, noted that Defendant - acting *pro se* - had repeatedly and baselessly accused opposing counsel of fraud and the District Judge of bias. (*Id.*)

Though she has yet to avail herself of the courts in her present campaign against AIG, Defendant's conduct in the instant case thus far is equally egregious, and should not be countenanced. AIG respectfully submits that the Court should issue a temporary restraining order and preliminary injunction directing Defendant to: (1) refrain from further disclosing AIG's Protected Information; (2) return to AIG all such information without keeping any copies; and (3) return to AIG the AIG computers and Blackberry that remain in Defendant's possession despite AIG's demands that they be returned.

## FACTUAL SUMMARY

### The Parties

AIG is, and at all relevant times has been, the world's leading insurance enterprise. Until December 6, 2006, Defendant was employed as a Vice President in AIG's Office of Accounting Policy. Defendant was an AIG employee for less than one year.

### Defendant's Employment with AIG

AIG hired Defendant in early 2006 to work in the New York Office of Accounting Policy, though she was later assigned as the Accounting Policy designate within the Hong Kong Office of AIA Accounting. (Richardson Decl. ¶ 9).

AIG's Office of Accounting Policy is in charge of establishing AIG's official accounting policies. (*Id.*) Defendant's function was to review the specific details of individual

transactions executed by AIG in order to determine questions of accounting treatment. She also was involved in the approval process of particular transactions.

Defendant's position gave her access to a significant amount of AIG's Protected Information. (*Id.* at ¶ 10). Among other things, she was made privy to the fine details of individual business transactions that AIG had entered into, as well as confidential transactions that were in progress but had not been publicly disclosed, and deals that AIG and its affiliates had identified as attractive, though had yet to actually close. (*Id.* at ¶ 10). AIG's lawyers provided Defendant with confidential legal opinions and analysis of such transactions and accounting related issues. (*Id.* at ¶ 10). Defendant was also made privy to confidential information concerning the investment strategy of particular AIG affiliates and their specific holdings in stocks and bonds among other investments.

**Defendant's Contractual Commitments to Protect AIG's Protected Information**

AIG required Defendant to agree to adhere to multiple contracts that were designed to protect its confidential information. (*Id.* at ¶ 11). The first such agreement was Defendant's offer letter dated January 27, 2006 (the "Offer Letter") which set forth the terms and conditions of her employment with AIG, and directed her to report to AIG in New York for work. (*Id.* at ¶ 12). The Offer Letter specified that "[t]his offer is contingent upon ... *your execution and return of the Non-Solicitation* [and Non-Disclosure] *Agreement which is enclosed.*" (emphasis in original). (*Id.*) Defendant signed her Offer letter and the Non-Solicitation and Non-Disclosure Agreement on January 31, 2006. (*Id.*)

The Non-Solicitation and Non-Disclosure Agreement, in turn, further specified that it "is necessary for the protection of the legitimate and protectable business interests of the Company and its affiliates (collectively, "AIG") in their ... confidential and proprietary

information." (emphasis added). (*Id.* at ¶ 14). Notably, in the Non-Solicitation and Non-Disclosure Agreement, Defendant expressly acknowledged that her "employment with AIG requires exposure to and use of confidential business information (as set forth in paragraph 4)." (*Id.*) Paragraph 4, in turn, provided that all such information "will be treated by [Defendant] in the strictest confidence and will not be disclosed or used by [Defendant] in any manner without the prior written consent of the Company or unless required by law." (*Id.*)

In signing the Non-Solicitation and Non-Disclosure Agreement, Defendant also expressly acknowledged that injunctive relief would be necessary to address any violation of her confidentiality obligations under the agreement. (*Id.* at ¶ 15). Specifically, she acknowledged that "irreparable damages would result to [AIG] if the [confidentiality provisions] were not complied with" and she further agreed that AIG would be "entitled to legal, equitable and other remedies, including, without limitation, injunctive relief, to protect against the inevitable disclosure of the Company's confidential, proprietary or secret information."[1] (*Id.*)

Finally, Defendant also agreed that the Non-Solicitation and Non-Disclosure Agreement "SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO CHOICE OF LAW RULES (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK, AND [She] CONSENTS TO THE NONEXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS IN NEW YORK." (all capitals in original). (*Id.* at ¶ 17).

---

[1] As a further commitment under the Non-Solicitation and Non-Disclosure Agreement, Defendant agreed that she "shall be liable for the attorneys' fees and costs incurred by AIG as a result of [her] breach of [the confidentiality provisions] of this Agreement." (Richardson Decl. ¶ 16).

Defendant also agreed in writing to comply with the AIG Code of Conduct and the AIG Employee Handbook, each of which independently obligate her to protect AIG's Protected Information. (*Id.* at ¶ 18). The AIG Code of Conduct provides that "[a]n AIG employee may not disclose to any non-AIG employee who is not authorized to receive such information, any of AIG's confidential or proprietary information or trade secrets whether in written, electronic or verbal form." (*Id.*) The Code of Conduct further provides that the obligation to protect AIG's confidential information continues after the termination of employment. (*Id.*) The AIG Employee Handbook contains essentially identical provisions. (*Id.* at ¶ 19).

**Defendant's Insubordination and Termination**

Beginning almost immediately after her hiring, Defendant was unwilling to cooperate with others at AIG or to take direction from her superviors. (*Id.* at ¶ 21). On or about July 18, 2006, Defendant received a verbal warning that her performance was deficient in several respects. (*Id.* at ¶ 22). On or about July 24, 2006, Defendant received a written warning, which reiterated that her performance was substantially below the standards expected by AIG and specified that Defendant "must sustain improvement in the areas noted above and perform satisfactorily in all job responsibilities" or face "disciplinary action up to and including termination." (*Id.* at ¶ 23, 26).

In November 2006, in part due to Defendant's continued failure to properly perform her job duties, Kenneth Rappold was hired as Defendant's supervisor in Hong Kong. (*Id.* at ¶ 27). Defendant was specifically told that she was to report to Mr. Rappold. (*Id.*). Defendant acknowledged that Mr. Rappold was her new boss. (*Id.* at ¶ 28).

On November 20, 2006, Mr. Rappold left Defendant a phone message requesting a meeting that day. (*Id.* at ¶ 29). Defendant did not respond, nor did she report for work that day. (*Id.*; Rappold Decl. ¶ 3). Instead, Defendant submitted a request for leave from November 21 through December 1, 2006. (Richardson Decl. ¶ 29; Rappold Decl. ¶ 3). Despite the fact that Mr. Rappold did not approve her leave application, Defendant stayed out of the office and had no contact with AIG from November 21 through December 1, 2006. (Richardson Decl. ¶ 29; Rappold Decl. ¶ 4).

On December 1, 2006, Mr. Rappold sent an e-mail to Defendant informing her that her physical office was being moved to the building where he was located and that she should no longer work from her old office. (Richardson Decl. ¶ 32; Rappold Decl. ¶ 4). Defendant ignored that directive and continued to work in her old office. (Richardson Decl. ¶ 33; Rappold Decl. ¶ 4). She also continued to ignore Mr. Rappold's requests to meet with her. (Rappold Decl. ¶ 5).

On the morning of December 6, 2006, Mr. Rappold and several other employees met with Defendant and informed her that her employment had been terminated. (*Id.* at ¶ 6). Defendant, in response, alleged that AIG had engaged in accounting irregularities and, in a transparent attempt to extort money from AIG in exchange for keeping her concerns private, demanded to know what her "settlement" would be. (*Id.* at ¶ 7). Defendant was informed that she would not receive any "settlement" and that she should raise any concerns about purported improprieties through appropriate channels. (*Id.* at ¶ 8).

**Defendant Discloses AIG's Protected Information**

On December 6, 2006, after leaving AIG's premises with her demand for "settlement" unmet, Defendant circulated an e-mail to numerous individuals in which Defendant

alleged that AIG had violated certain unspecified legal requirements in foreign countries and had engaged in unspecified accounting misconduct. (*Id.* at ¶ 9; Richardson Decl. ¶ 38). Among the recipients of this e-mail was David Boies, Esq., of the law firm Boies Schiller & Flexner LLP. (Rappold Decl. at 9; Richardson Decl. ¶ 38). The Boies Schiller firm currently represents C.V. Starr & Co., Inc. and its affiliates, which are competitors of AIG and have been engaged in various litigations and arbitrations against AIG and its affiliates for the better part of 2006. (Rappold Decl. ¶ 9; Richardson Decl. ¶ 40). Boies Schiller also represents Starr International Co., which is presently adverse to AIG in a significant and highly-publicized litigation.

On December 7, 2006, Defendant sent an additional e-mail to many of the same recipients of her December 6 e-mail, including Mr. Boies, attaching numerous other internal AIG e-mails and memoranda reflecting legal advice from AIG's lawyers on various legal issues. (Toro Decl. ¶ 3). These memoranda are all confidential and are privileged attorney-client communications. They clearly constitute AIG's Protected Information that AIG never intended to reveal to third parties. Her employment having been terminated, Defendant had no right to possess them, much less disclose them to others.[2]

On December 8, 2006, Alfred Panasci, Director of AIG's Internal Audit Investigative Group, sent an e-mail to Defendant informing her that AIG took her "allegations seriously and [was] in the process of reviewing them." (Richardson Decl. ¶ 44). In addition, Mr. Panasci asked Defendant for "any additional information and/or documents that [she could] provide us in order to verify the allegations" and specifically asked Defendant to e-mail, fax or send to him "any documents or information." (*Id.*). Alternatively, Mr. Panasci wrote, "[i]f you wish, you can provide me with a telephone number and time when I can reach you." (*Id.*)

---

[2] AIG demanded that Boies Schiller return the materials it had received from Defendant, and it agreed to do so.

76488/2023273.1                                  7

Defendant responded by e-mail to Mr. Panasci, stating that she would "rather work with SEC and Eliot Spitzer," but provided no information or documents concerning her broad allegations. (*Id.* at ¶ 45). Defendant forwarded this e-mail to many of the same recipients of her December 6 and 7 e-mails, including Mr. Boies. (*Id.*)

On December 13, 2006, counsel for AIG wrote to Defendant demanding that she cease and desist from further revealing AIG's Protected Information to third parties. (*Id.* at ¶ 47). Counsel reminded Defendant of her contractual obligations to protect such information and asked that Defendant: "(i) return ... any and all AIG documents, files, data or information in any other form that [she] possess[es], and (ii) instruct any party to whom [she] ha[d] recently given such materials to return them ... immediately." (*Id.*). Counsel also asked Defendant to "confirm in writing when [she] ha[d] returned all such materials ... without retaining any copies, and also identify each third party to whom [she] ha[d] disclosed such materials." (*Id.*). Finally, counsel asked Defendant to return the AIG laptop computers and Blackberry device that she still possesses. (*Id.*).

In AIG's counsel's letter of December 13, 2006, counsel also conveyed that AIG takes Defendant's allegations seriously, and did not seek to prevent her from making appropriate reports to regulators. (*Id.* at ¶ 48). Counsel further advised Defendant that her allegations (though not AIG's Protected Information) related to issues that had already been known to AIG and shared with appropriate regulators by AIG. (*Id.*).

Defendant responded on December 14, 2006 with an e-mail in which she neither agreed to refrain from disclosing AIG's privileged and confidential information nor to return it. (*Id.* at ¶ 49). Defendant also did not agree to return the laptop computers or Blackberry device that belong to AIG. (*Id.*). Since December 14, 2006, Defendant has repeatedly disseminated to

persons inside and outside of AIG e-mails relating to AIG accounting issues and transactions. (*Id.* at ¶ 50).

### Defendant's Misappropriation of AIG Information

Forensic analysis has demonstrated that in the approximately two and one-half months prior to her termination, Defendant sent approximately 226 e-mails from her AIG e-mail account. (Toro Decl. ¶ 8). Approximately 117 of those e-mails were sent to a single private e-mail account outside of AIG, which, on information and belief, is an account maintained by Defendant. (*Id.* at ¶ 9). Among those, was an e-mail dated December 4, 2006 containing one of the privileged communications that Defendant sent to Boies Schiller on December 7, 2006. (*Id.* at ¶ 7). Thus, Defendant regularly and without authorization forwarded to herself confidential AIG e-mails to which she now has continued unauthorized access. Defendant also has continued unauthorized access to AIG e-mails by virtue of her failure to return the laptop computers and Blackberry that AIG issued to her. (*Id.* at ¶ 10).

Following her termination, AIG examined Defendant's AIG e-mail account and found that all of the items in Defendant's "sent items" folder had been "double deleted," or otherwise removed so as to be unrecoverable absent restoration, except for those which were sent on the day of her termination. (*Id.* at ¶ 8). Thus, it appears that Defendant was aware that she was engaged in improper conduct when she forwarded confidential AIG emails to herself and deleted or otherwise removed AIG e-mail property, and she sought to hide her conduct from AIG.

## ARGUMENT

### THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, the moving party must demonstrate "(a) irreparable harm, and (b) either (1) likelihood of success on the merits, or (2) sufficiently

serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). It is well-settled under New York law that injunctive relief is appropriate to prevent the unauthorized disclosure -- including threats of disclosure -- of confidential and/or trade secret information.[3]

### A.  AIG Will Suffer Irreparable Harm Absent Injunctive Relief

The first prong of the Hood test for injunctive relief -- irreparable harm -- is satisfied here. AIG seeks preliminary injunctive relief in order to prevent Defendant from permanently damaging AIG's economic and competitive interests pending the resolution of this dispute. Defendant's conduct has caused, and will continue to cause, irreparable harm because AIG's loss of its privileged and confidential information cannot be compensated by money damages. See Danielson v. Local 275, 479 F.2d 1033, 1035 (2d Cir. 1973) ("Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate.").

It is well-settled that the disclosure of confidential information by a former employee to a competitor constitutes harm satisfying the "irreparable harm" standard required for

---

[3] See Columbia Ribbon & Carbon Mfg. Co. v. A-I-A Corp., 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 1007, 369 N.E.2d 4, 6-7 (1977) (recognizing that injunctive relief is appropriate to enforce a restrictive covenant in order to protect an employer from an "employee's use or disclosure of trade secrets or confidential customer lists"); Contempo Communications, Inc. v. MJM Creative Servs., Inc., 182 A.D.2d 357, 353, 582 N.Y.S.2d 667, 668-69 (1st Dep't 1992) (stating that "[a]n employee's use or disclosure of trade secrets or confidential information will be enjoined"); Ecolab Inc. v. Paolo, 753 F.Supp. 1100 (E.D.N.Y. 1991) ("The use and disclosure of an employer's confidential information ... constitute[s] irreparable harm."); FMC Corporation v. Taiwan Tainan Giant Indus. Co., Ltd. 730 F.2d 61, 63 (2d Cir. 1984) (finding that injunctive relief was appropriate "based on ... misappropriation of trade secret and breach of confidentiality agreement claims" because "[a] trade secret once lost is, of course, lost forever."); Doubleclick, Inc. v. David Henderson, No. 116914/97, 1997 WL 731413 (N.Y. Sup. 1997) (imposing an injunction to protect an employer's trade secrets); Alert Holdings Inc. v. Interst. Protective Servs., 148 B.R. 194, 200 (S.D.N.Y. 1992) (recognizing that the use and disclosure of confidential information with a resulting loss of business qualifies as irreparable harm); Business Intelligence Servs. Inc. v. Hudson, 580 F.Supp. 1068, 1071 (S.D.N.Y. 1984) (recognizing that it is appropriate to enforce a non-competition agreement where necessary to "protect against the disclosure of trade secrets or other confidential information"). Injunctive relief is particularly appropriate in cases like this one where the confidential information at issue is also privileged under the attorney-client privilege. See Data-Track Account Servs., Inc. v. Lee, 291 A.D.2d 827, 736 N.Y.S.2d 558, 560 (4th Dep't 2002) (holding that former clients were entitled to injunction barring attorney from continuing to disclose confidences and secrets obtained during his engagement as counsel).

76488/2023273.1                        10

a preliminary injunction. See, e.g., Ecolab Inc., 753 F.Supp. at 1100; Alert Holdings Inc., 148 B.R. at 200. Where, as here, the confidential information is also privileged, irreparable harm is doubly-shown. See Data-Track, 291 A.D. at 827 (finding that former clients established irreparable harm by demonstrating that their former attorney had made repeated disclosures of confidential information to their detriment). Defendant, moreover, acknowledged in her Non-Disclosure and Non-Solicitation Agreement that disclosure of AIG's Protected Information would cause AIG to suffer irreparable harm. See North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999) (finding that irreparable harm standard for grant of preliminary injunction was met in part by relying on clause in employment contract which acknowledged that breaches of confidentiality would cause irreparable harm); Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999) (noting that an agreement which specifies that breaches will cause irreparable harm "might arguably be viewed as an admission" of irreparable harm for purposes of upholding the grant of an injunction); see also Alpha Capital Aktiengesellschaft v. Advanced Viral Research Corp., No. 02 CV 10237, 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003) (noting that Ticor gave "great weight" to a contractual stipulation that irreparable harm exists in the event of a breach for the purpose of upholding the grant of an injunction).

**B.    AIG Is Likely to Succeed on the Merits of Its Claims**

AIG asserts claims under New York law[4] against Defendant for breach of fiduciary duty, breach of contract, misappropriation of confidential information, conversion and

---

[4] Defendant's Non-Solicitation and Non-Disclosure Agreement provides that any disputes arising under the agreement, including its confidentiality provisions, shall be governed by New York law. Defendant also signed a letter agreement covering her assignment in Hong Kong (the "Assignment Letter") which provides that Bermuda common law applies, but only to disputes relating to the subject matter of the assignment. The Assignment Letter does not apply here because this case does not relate to the assignment. Instead, AIG here seeks to enforce confidentiality agreements that Defendant entered into with AIG in New York, including the Non-Solicitation and Non-Disclosure Agreement, which, again, calls for the application of New York law. The Assignment Letter does not purport to have any effect on those separate confidentiality obligations (whether by making any changes to the applicable law or otherwise). In any case, even if this Court were to conclude that Bermuda law applied, AIG would

violation of the Computer Fraud and Abuse Act ("CFAA"). Given Defendant's conduct, AIG is at the very least likely to prevail on some or all of these claims and to obtain relief requiring Defendant to return AIG's property and cease her improper behavior. Accordingly, the latter prong of the Hood test for preliminary injunctions is satisfied here.

### 1. AIG Will Prevail On Its Breach Of Fiduciary Duty Claim

As an employee, Defendant owed common law fiduciary obligations to AIG.[5] It is a firmly established principle "in the law of this State that an employee 'is prohibited from acting in any manner inconsistent with [her] agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of [her] duties.'" DoubleClick, Inc. v. Henderson, No. 116914/97, 1997 WL 731413 at *6 (Sup. Ct. N.Y. Co. Nov. 7, 1997) (citation omitted). New York law is clear that employees have a duty to "hold sacred any trade secrets or other confidential information" acquired during the course of employment. L.M. Rabinowitz & Co, Inc. v. Dasher, 82 N.Y.S.2d 431, 435 (N.Y. Sup. Ct. 1948) (internal citations omitted); see also ABKCO Music Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 994 (2d Cir. 1983) (holding that an agent has a duty not to use confidential knowledge acquired in his employment in competition with his principal). An employee's duties to preserve the employer's confidential information continue even after the employment relationship ends. Am. Fed. Group, Ltd. v.

---

be entitled to injunctive relief here, because Bermuda common law recognizes that -- even in the absence of a contract -- employees are duty bound to protect the confidentiality of their employer's confidential information, even after the employment relationship ends. See Affidavit of Paul A. Smith dated December 20, 2006. Moreover, Bermuda courts would grant an injunction to prevent an employee from disclosing her employer's confidential information in a case like this one, and Bermuda courts can and do enter such injunctions on an *ex parte* basis where appropriate. Id. In addition, Bermuda law also recognizes the equivalent of the principal causes of action asserted by AIG here. Id. Thus, there is no true conflict between New York and Bermuda law that would impact the outcome on the instant application.

[5] Under New York law, as in other jurisdictions, employees owe a fiduciary duty to their employers. See CBS Corp. v. Dumsday, 268 A.D.2d 350, 353 (N.Y. App. Div. 2000) ("it is axiomatic that an employee is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" (citation omitted)); Kaufman v. Int'l Bus. Machines, 97 A.D.2d 925, 927 (N.Y. App. Div. 1983) (employee "had both a contractual and a fiduciary duty not to disclose any [of former employer's] confidential information ... for his own purposes.").

Rothenberg, 136 F.3d 897, 914 (2d Cir. 1998) (noting that an employee's fiduciary duty to the employer may continue after termination of the employment relationship); see also ABKCO, 722 F.2d at 994 (holding that the duty not to use confidential information acquired during the course of employment exists after the employment is terminated); Byrne v. Barrett, 268 N.Y. 199, 197 N.E.217 (1935) (same).

Here, it is obvious that Defendant violated her fiduciary duties to AIG. Defendant disclosed AIG's Protected Information that she was duty bound to protect to litigation counsel for AIG's litigation adversary, and she is threatening to continue to do so. Under New York law, these actions constitute a clear violation of Defendant's fiduciary duty to AIG.

### 2. AIG Will Prevail On Its Breach of Contract Claim

To establish a claim for breach of contract, AIG must prove: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach of the contract by the other; and (4) damages resulting from the breach. See K. Bell & Assocs. v. Lloyd's Underwriters, 827 F. Supp. 985, 988 (S.D.N.Y. 1993). AIG satisfies these elements.

The conduct described in the Declaration of Katherine Richardson undoubtedly establishes a claim for breach of contract. As a condition of her employment with AIG, Defendant agreed to multiple contractual commitments to protect AIG's Protected Information. Defendant signed the Non-Solicitation and Non-Disclosure Agreement on January 31, 2006. Subsequently, on February 16, 2006, Defendant signed an agreement to uphold the provisions of the AIG Code of Conduct and an acknowledgement that she received the Employee Handbook. Defendant thus repeatedly agreed to be bound by confidentiality obligations as an express condition of her employment with AIG. As noted above, there is no question here that she breached such commitments, thus grounding a claim for breach of contract.

### 3. AIG Will Prevail On Its Claims For Misappropriation of Confidential and Proprietary Information

To prevail on a claim for misappropriation of confidential and proprietary information, New York law requires that a plaintiff demonstrate that it possessed confidential information, and that the defendant used the confidential information in breach of an agreement *or* a confidential relationship or duty, *or* as a result of discovery by wrongful means. North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999).

As detailed above, Defendant has wrongfully taken possession of AIG's Protected Information by forwarding AIG e-mails to her personal e-mail accounts and refusing to return AIG computers and a Blackberry containing such e-mails and information. Further, she has breached both contractual and common law duties not to utilize AIG's Protected Information for the benefit of anyone other than AIG and is threatening to continue to do so. Accordingly, AIG will prevail on its claim against Defendant for misappropriation of confidential and proprietary information.

### 4. AIG Will Prevail On Its Claim For Conversion

"The tort of conversion is established when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner." Republic of Haiti v. Duvalier, 626 N.Y.S.2d 472, 475 (1st Dep't 1995) (citations omitted); Peters Griffin Woodward, Inc. v. WCSC, Inc., 452 N.Y.S.2d 599, 600 (1st Dep't 1982) ("Conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."). Despite repeated requests, Defendant refuses to return the laptop computers and Blackberry device that rightfully belong to AIG. She has also wrongfully taken possession of AIG's Protected Information by holding onto such equipment and by

forwarding AIG e-mails to her personal e-mail accounts. She also willfully destroyed AIG's e-mail property by deliberately deleting or otherwise removing it from AIG's computer system. Accordingly, AIG is likely to prevail upon a claim of conversion.

### 5. AIG Will Prevail On Its Claim For Violations of the Computer Fraud and Abuse Act ("CFAA")

The CFAA is a broad remedial statute allowing employers to sue former employees who illegally misappropriate confidential information. See Pacific Aerospace & Electronics, Inc. v. Taylor, 295 F. Supp. 2d 1188 (E.D. Wash. 2003) (imposing injunctive relief against former employee alleged to have improperly obtained confidential information and trade secrets). Section 1030(g) provides companies an explicit private right of action to combat former employees who make use of proprietary information obtained from their former employer's computer database or linked workstations. Pacific Aerospace, 295 F. Supp. 2d at 1195-96.

A private CFAA claim has four basic elements: (1) accessing a "protected computer"; (2) without authorization or by exceeding such authorization as was granted; (3) knowingly and/or with intent to defraud; and (4) causing damage, loss or obtaining anything of value. 18 U.S.C.A. § 1030(a)(4); P.C. Yonkers, Inc. v. Celebrations The Party And Seasonal Superstore, LLC, 2005 WL 2931940, * 3 (E.D. Wash. 2003). Here, Plaintiffs easily satisfy each element.

First, AIG's computers satisfy the CFAA's broad statutory definition of "protected computers," which includes any such device "used in interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B). Indeed, any computer connected to the Internet would appear to qualify.

Here, Plaintiffs' computers not only are connected to the Internet and used in "interstate or foreign commerce," but are linked to each other via an international network of servers that coordinate communication and data transfer among AIG's numerous domestic and foreign subsidiaries and offices. There is no question they are within the statutory definition.

Second, Defendant's access to AIG's computer network was (and still is) unauthorized. Section 1030(a)(2) of the CFAA authorizes a civil action against "whoever . . . intentionally accesses a computer without authorization or <u>exceeds authorized access</u>" and causes resulting damage or loss thereto. (Emphasis added). Here, Defendant at a minimum exceeded her authorized access by forwarding AIG e-mails housed on AIG's computer network to her personal e-mail account and then transmitting those e-mails to third-parties without authorization.

In <u>Charles Schwab & Co., Inc v. Carter</u>, No. 04 C 7071, 2005 WL 351929, at *3 (N.D. Ill. Feb. 11, 2005), a financial services plaintiff sued its former employee for misappropriation of financial services trade secrets and confidential information. Prior to the employee's termination, he allegedly transferred confidential data to his new employer via Schwab's email system. The court upheld liability against the employee under the CFAA despite the fact that the employee had legitimate access to the material when it was sent, noting that the employee's actions were clearly in contravention of the CFAA because his intent and ultimate transmission of Schwab's trade secret information exceeded his authorization – i.e., the employee had a right to access Schwab's computer system, but not a right to transfer confidential data to third party competitors.[6]

---

[6] To similar effect is <u>Pacific Aerospace</u>, 295 F. Supp. 2d 1188, in which an employer successfully obtained a preliminary injunction against its former employee and the employee's new employer pursuant to the CFAA. The plaintiff in that case, Pacific Aerospace, had given the defendant employee broad access to confidential customer lists, proprietary technology and other similarly sensitive information. The employee resigned and Pacific

Third, it cannot be disputed that Defendant's conduct was (and is) intentional. AIG has every reason to believe that Defendant willfully and intentionally used AIG's computer system in order to obtain as much privileged and confidential information as possible. It is inconceivable that she forwarded e-mails to herself and then sent those e-mails on to third parties by accident.

Finally, Defendant has caused, and continues to cause, significant damages and losses to AIG through the unauthorized use of AIG's computer system. The CFAA describes damage as "any impairment to the integrity or availability of data, a system, or information." 18 U.S.C. § 1030(e)(8). "Loss" is treated separate from damage, and is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). If a plaintiff (such as here) seeks relief under Section 1030(a)(5)(B)(i), the "loss" (not damage) must aggregate to at least $5,000 in value. I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc., 307 F. Supp. 2d 521, 525-26 (S.D.N.Y. 2004).

There is no question in this case that AIG has suffered considerable injury to the integrity of its system of maintaining the confidentiality of its privileged and confidential information as a result of Defendants' conduct. In the wake of Defendant's disclosure, AIG has conducted an investigation to determine the means used to disclose the information. To prevent

---

Aerospace belatedly discovered that the employee had downloaded sensitive data to a disk and taken it with him to his new employer, who was using the information to compete against plaintiff. On these facts, the court granted plaintiff a preliminary injunction preventing defendants from, inter alia, delivering any product related to the confidential information illegally obtained from plaintiff's computer system. The court also ordered defendants to "return all property belonging to [plaintiff] including all copies of any [plaintiff] customer information or lists . . . ." Id. at 1205.

further breaches of AIG's confidentiality agreements with its employees, AIG will have to deploy additional personnel to review Defendant's email account and to review out-bound messages and email rules for suspicious activity. In short, AIG has and will have to expend far in excess of $5,000 to remediate the damage that Defendant's use of AIG's computer system has caused. See I.M.S. Inquiry, 307 F. Supp. 2d at 524 (upholding damage and loss allegations based on boilerplate allegations of spending more than $5,000 on "damage assessment and remedial measures").

C.   **Balance of Hardships Tip Strongly in AIG's Favor**

The balance of harm in this case heavily favors AIG. The injunction AIG requests would do no more than require Defendant to abide by the contractual and common law duties she already owes AIG. On the other hand, if the injunction is denied, Defendant will continue to disclose AIG's confidential and privileged information, exposing AIG to irreparable harm and further harassment. This is not conduct she has the right to engage in. In addition, the injunction sought here is in the public interest. See Saini, 434 F. Supp. 2d at 925 ("Since . . . individuals are not free to ignore confidentiality agreements, it follows there is a public interest in enforcing confidentiality agreements. At the very least, there is no public interest against enforcing the [confidentiality] agreement where an individual has taken it upon himself to disclose confidential information solely for pecuniary gain.").

## Conclusion

For the foregoing reasons, AIG's motion for an injunction should be granted.

Dated: New York, New York
       December 22, 2006

QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP

By: _____
    Michael B. Carlinsky (MC-6594)
    Kevin S. Reed (KR-5386)
    Alexander C.B. Barnard (AB-3181)

51 Madison Ave., 22nd Floor
New York, New York 10010
Tel.: (212) 849-7000

Attorneys for American International Group, Inc.

76488/2023273.1                              19